UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HINDY KLEIN,

                        Plaintiff,

-against-

EXPERIAN INFORMATION SOLUTIONS, INC., et al.,

                        Defendants.

**MEMORANDUM OPINION AND ORDER**

19-CV-11156 (PMH)

PHILIP M. HALPERN, United States District Judge:

       Plaintiff Hindy Klein ("Plaintiff") brings this action against Experian Information Solutions, Inc. ("Experian"), Transunion, LLC[1] ("Transunion"), Equifax Information Services, LLC ("Equifax"), American Express Company[2] ("Amex"), and Chase Bank (USA), N.A. ("Chase" and collectively, "Defendants") alleging that each willfully or negligently violated the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.* (Doc. 1, "Compl.").[3]

       Before the Court is Amex's motion to compel Plaintiff to arbitrate her claims and stay the action against Amex pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.* Amex filed its motion on June 18, 2020 (Doc. 44; Doc. 45, "Amex Br."), Plaintiff filed her opposition on

---

[1] The Court notes that while this Defendant is identified as "Transunion" in the Complaint, the associated Notice of Appearance identifies that entity as "Trans Union" without explanation. (*Compare* Compl., *with* Doc. 13). The Court uses the name listed in the Complaint.

[2] In contrast to the discrepancy regarding Transunion's proper name, Amex maintains—without objection—that it was "incorrectly" or "erroneously" named in the Complaint as American Express Company and that the entity is properly referred to as "American Express National Bank." (*See* Docs. 22-23, 35-36, 40, 44). As there has been no motion to amend the caption, the Court uses the name listed in the Complaint.

[3] Plaintiff has voluntarily dismissed Equifax, Chase, and Experian from this action with prejudice. (*See* Docs. 39, 57, 60). Accordingly, the case proceeds against only Amex and Transunion.

June 26, 2020 (Doc. 51, "Opp'n. Br."), and the motion was fully briefed with Amex's submission of a reply memorandum of law on July 15, 2020 (Doc. 54, "Reply Br.").[4]

For the reasons set forth below, Amex's motion to compel arbitration and stay the action against it pending the resolution of arbitration is GRANTED.

## BACKGROUND

I. Plaintiff's Allegations Against Amex

Plaintiff complains that Amex furnished inaccurate information to Experian, Equifax, and Transunion, which, in turn, led those companies to produce credit reports about Plaintiff that contained inaccurate information. (*See generally* Compl. ¶¶ 18-30). Specifically, Plaintiff alleges that the credit reports produced by Experian, Equifax, and Transunion indicated that Plaintiff's Amex "account ha[d] the status as charged off but yet the account still include[d] a current past due balance"—which was illogical because "[t]he debt cannot be charged off and still be[] reflected [as] a past due balance"—and that, in any event, the "past due amount [was] different from the balance" that Plaintiff actually owed to Amex. (*Id*. ¶¶ 20-21). Although Plaintiff protested that the information regarding Amex was incorrect, Amex "failed to conduct a reasonable investigation and continued to report false and inaccurate, adverse information on the consumer report of the Plaintiff with respect to the disputed account, and is still reporting a past due balance owed different from the overall balance despite the charge off status." (*Id*. ¶ 25). On these allegations, Plaintiff maintains that Amex willfully or negligently violated the FCRA. (*Id*. ¶¶ 85-104).

---

[4] Along with the memorandum of law in support its motion, Amex filed the Declaration of Keith Herr, an Assistant Custodian of Records for Amex. (Doc. 46, "Herr Decl."). Annexed to that Declaration were two Exhibits: (1) a copy of the Cardmember Agreement that Amex mailed to Plaintiff (Doc. 46-1, "Herr Decl. Ex. A"); and (2) a redacted copy of the April 2018 billing statement associated with Plaintiff's Amex account (Doc. 46-2, "Herr Decl. Ex. B"). References to Exhibits correspond to the page numbers assigned by ECF.

II.   The Cardmember Agreement

Plaintiff opened a credit card account with Amex "in or about May 2016." (Herr Decl. ¶ 3). When Plaintiff opened her account, Amex sent her a copy of a written Cardmember Agreement ("Cardmember Agreement") which "set[] forth the terms and conditions of the cardmember's account." (*Id.*). According to the Cardmember Agreement, Plaintiff accepted the terms of the contract by "us[ing] the Account" or by "sign[ing] or keep[ing] the card." (*Id*. Ex. A at 8). The Agreement contained an arbitration clause that advised as follows:

> You or we may elect to resolve any claim by individual arbitration. Claims are decided by a neutral arbitrator.
>
> **If arbitration is chosen by either party, neither you nor we will have the right to litigate that claim in court or have a jury trial on that claim. Further, you and we will not have the right to participate in a representative capacity or as a member of any class pertaining to any claim subject to arbitration. Arbitration procedures are generally simpler than the rules that apply in court, and discovery is more limited. The arbitrator's decisions are as enforceable as any court order and are subject to very limited review by a court. Except as set forth below, the arbitrator's decision will be final and binding. Other rights you or we would have in court may also not be available in arbitration**.

(*Id*. Ex. A at 13 (bold in original)). As for what constitutes a "claim," the Cardmember Agreement provided:

> ***Claim*** means any current or future claim, dispute or controversy relating to your Account(s), this Agreement, or any agreement or relationship you have or had with us, except for the validity, enforceability or scope of the Arbitration provision. ***Claim*** includes but is not limited to . . . (2) <u>claims based upon contract, tort, fraud, statute, regulation, common law and equity</u> . . . .

(*Id*. (bold and italics in original, underline added)).

Notably, Plaintiff was not bound to accept the Cardmember Agreement's arbitration clause. Under the heading, "**Your Right to Reject Arbitration**," the contract outlined the process

required to reject arbitration and noted that, "[i]f your rejection notice complies with these requirements, this Arbitration provision and any other arbitration provisions in the cardmember agreements for any other currently open American Express accounts you have will not apply to you . . . ." (*Id*. Ex. A at 13-14 (bold in original)). The Cardmember Agreement also warned that Amex would provide information to credit reporting companies. The contract explained, "You agree that we will give information about the Account to the credit reporting agencies. We will tell a credit reporting agency if you fail to comply with any term of this Agreement. This may have a negative impact on your credit report." (*Id*. Ex. A at 11; *see also id*. Ex. A at 2-3 (outlining how credit reports are used in issuing credit and Plaintiff's "right to dispute any inaccurate information" therein)). That same section provided an address for Plaintiff to contact in the event Plaintiff believed Amex provided incorrect information. (*Id*. Ex. A at 11).

The Cardmember Agreement also contained a severability clause which provided that "[t]his section will survive termination of your Account . . . . If any portion of this Claims Resolution section, except as otherwise provided in the Limitations on Arbitration subsection, is deemed invalid or unenforceable, it will not invalidate the remaining portions of this Claims Resolution section." (*Id*. Ex. A at 14). Finally, pertinent to the analysis herein, the contract states on its face that, "Utah law and federal law govern this Agreement and your Account. They govern without regard to internal principles of conflicts of laws. We are located in Utah. We hold your Account in Utah. We entered into this Agreement with you in Utah." (*Id*. Ex. A at 12). The parties agree that Utah law governs the agreement. (Amex Br. at 6 ("American Express cardmember agreements are expressly governed by a Utah choice-of-law provision."); Opp'n. Br. at 5 ("The applicable state law is Utah . . . .")).

## STANDARD OF REVIEW

"In deciding motions to compel [arbitration], courts apply a 'standard similar to that applicable to a motion for summary judgment.'" *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (quoting *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003)). "As on a motion for summary judgment, the parties may submit documents in support or opposition of their motion, and the court 'consider[s] all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, and draws all reasonable inferences in favor of the non-moving party.'" *Cornelius v. Wells Fargo Bank, N.A.*, No. 19-CV-11043, 2020 WL 1809324, at *4 (S.D.N.Y. Apr. 8, 2020) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 155 (2d Cir. 2002) (alteration in original)). "If the party seeking arbitration demonstrates its entitlement to arbitration by a showing of evidentiary facts, the burden then shifts to the opposing party to submit evidentiary facts demonstrating there is a dispute of fact showing that the agreement is inapplicable or invalid." *Id.*; *see also Citadel Servicing Corp. v. Castle Placement, LLC*, 431 F. Supp. 3d 276, 284 (S.D.N.Y. 2019) ("[T]he 'party to an arbitration agreement seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid.'" (quoting *Harrington v. Atl. Sounding Co.,* 602 F.3d 113, 124 (2d Cir. 2010))). Opposition "may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried." *Citadel Servicing Corp.*, 431 F. Supp. 3d at 284 (quoting *Oppenheimer & Co. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995)). "'If undisputed facts in the record require[] the issue of arbitrability to be resolved against the [p]laintiff as a matter of law,' then a district court must compel arbitration." *Shetiwy v. Midland Credit Mgmt.*, 959 F. Supp. 2d 469, 473 (S.D.N.Y. 2013) (quoting *Bensadoun*, 316 F.3d at 175 (alterations in original)).

**ANALYSIS**

I.  Motion to Compel Arbitration

The FAA—which the parties agree governs this dispute—provides in pertinent part:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. "This provision establishes 'a liberal federal policy favoring arbitration agreements,'" *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012) (quoting *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)), and "reflects the overarching principle that arbitration is a matter of contract," *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013). *See also Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. 530, 532-33 (2013) (explaining that the FAA "requires courts to enforce the bargain of the parties to arbitrate" (internal quotation marks omitted)); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 336 (2011) (noting that "courts must place arbitration agreements on an equal footing with other contracts"); *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010) (observing that the FAA "places arbitration agreements on equal footing with other contracts, and requires courts to enforce them according to their terms" (internal citations omitted)); *Safra Secs., LLC v. Gonzalez*, 764 F. App'x 125, 125 (2d Cir. 2019) ("Whether parties have agreed to arbitrate a matter is fundamentally a question of contractual interpretation.").

Where, as here, the "dispute essentially concerns a [q]uestion[] of arbitrability, which is a term of art covering disputes about whether the parties are bound by a given arbitration clause, as well as disagreements about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy," courts in the Second Circuit apply a "two-part test." *Ostreicher*

6

*v. TransUnion, LLC*, No. 19-CV-8174, 2020 WL 3414633, at *5 (S.D.N.Y. June 22, 2020) (alterations in original, internal quotation marks omitted). Courts under this test "must consider (1) whether [the parties] 'have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement.'" *Scott v. JPMorgan Chase & Co.*, 603 F. App'x 33, 35 (2d Cir. 2015) (quoting *In re Am. Exp. Fin. Advisors Secs. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011)). However, before reaching the second element, courts must "determine who—the court or the arbitrator—properly decides the issue." *In re Am. Exp. Fin. Advisors Secs. Litig.*, 672 F.3d at 128 (citing *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 393 (2d Cir. 2011)). Moreover, "[i]f federal statutory claims are alleged, the court must also assess whether Congress intended to exempt such claims from arbitration." *Ostreicher*, 2020 WL 3414633, at *5 (quoting *Clookey v. Citibank, N.A.*, No. 14-CV-1318, 2015 WL 8484514, at *2 (N.D.N.Y. Dec. 9, 2015)).

      a. <u>The Parties Entered Into a Valid Agreement to Arbitrate Under Utah Law</u>

When considering the first prong on a motion to compel arbitration, "[s]tate contract law determines whether the parties entered into a valid agreement to arbitrate." *Simeon v. Domino's Pizza LLC*, No. 17-CV-5550, 2019 WL 7882143, at *2 (E.D.N.Y. Feb. 6, 2019). "Generally speaking, choice-of-law clauses have been applied to determine which state's law governs the validity of an arbitration agreement," and the Cardmember Agreement "require[s] this Court to apply Utah contract law in determining whether there is a valid agreement to arbitrate here." *Errato v. Am. Exp. Co.*, No. 18-CV-1634, 2019 WL 3997010, at *7 (D. Conn. Aug. 23, 2019). Applying Utah law, the Court concludes that the parties did enter into such a valid agreement.

Utah law states explicitly how and under what circumstances a "credit agreement"[5] shall be deemed "binding and enforceable without any signature by the party to be charged." Utah Code § 25-5-4(2)(e). Such an agreement is enforceable when:

> (i) the debtor is provided with a written copy of the terms of the agreement;
>
> (ii) the agreement provides that use of the credit offered shall constitute acceptance of those terms; and
>
> (iii) after the debtor receives the agreement, the debtor, or a person authorized by the debtor, requests funds pursuant to the credit agreement or otherwise uses the credit offered.

*Id.*; *see also* Utah Code § 70C-4-102(2)(b) (allowing "an open-end consumer credit contract . . . to include arbitration or other alternative dispute resolution mechanism[s]"). Amex has provided admissible evidence establishing each of these three elements without challenge: (1) Amex mailed the Cardmember Agreement to Plaintiff; (2) the Cardmember Agreement advised that use of the credit card constituted acceptance of the contract's terms; and (3) Plaintiff used the credit card. (Herr Decl. ¶¶ 3-5; *id*. Ex. A at 8; *id*. Ex. B). Accordingly, the Cardmember Agreement is "binding and enforceable" under Utah law. *See* Utah Code § 25-5-4(2)(e); *see also Khanna v. Am. Exp. Co.*, No. 11-CV-6245, 2011 WL 6382603, at *2-3 (S.D.N.Y. Dec. 14, 2011) (finding that the cardholder agreement governed by Utah law was enforceable); *MBNA Am. Bank, N.A. v. Goodman*, 140 P.3d 589, 592 (Utah Ct. App. 2006) (finding agreement enforceable where defendant was provided with the contract, the contract explained that the plaintiff accepted terms by using the credit card, and the plaintiff used the card).

---

[5] This phrase is defined as "an agreement by a financial institution to: (I) lend, delay, or otherwise modify an obligation to repay money, goods, or things in action; (II) otherwise extend credit; or (III) make any other financial accommodation." Utah Code § 25-5-4(2)(a)(i)(A).

Plaintiff does not dispute the fact that the Cardmember Agreement is binding under Utah Code § 25-5-4(2)(e). She argues instead that the contract should be disregarded because it is unconscionable. (Opp'n. Br. at 5-14, 16-22). This argument in unpersuasive.

"The standard for proving that a contract provision is unconscionable is very high (that is, the provision or circumstances must shock the conscience)." *Town Park Hotel Corp. v. Priskos Invs., Inc.*, No. 02-CV-164, 2006 WL 658896, at *10 (D. Utah Mar. 14, 2006) (internal quotation marks omitted). Under Utah law, when "determining whether a contract is unconscionable, [courts] use a two-pronged analysis. The first prong—substantive unconscionability—focuses on the agreement's contents. The second prong—procedural unconscionability—focuses on the formation of the agreement. But substantive unconscionability alone may support a finding of unconscionability." *Commercial Real Estate Inv., L.C. v. Comcast of Utah II, Inc.*, 285 P.3d 1193, 1203 (Utah 2012) (internal citations and quotation marks omitted). "Substantive unconscionability occurs when contract terms are so lopsided as to unfairly oppress or surprise an innocent party, or where there is an overall imbalance in rights and responsibilities imposed by the contract, excessive price or a significant cost-price disparity, or terms which are inconsistent with accepted mores of commercial practices." *Mitchell v. Wells Fargo Bank*, 280 F. Supp. 3d 1261, 1292 (D. Utah 2017) (internal quotation marks omitted). "Procedural unconscionability," on the other hand, "centers on the relative positions of the parties and the circumstances surrounding the execution of the contract, and occurs where there is an absence of meaningful choice and where lack of education or sophistication results in no opportunity to understand the terms of the agreement." *Id.* (internal quotation marks omitted). The Utah Supreme Court has outlined six factors to evaluate the presence of procedural unconscionability:

> (1) whether each party had a reasonable opportunity to understand the terms and conditions of the agreement; (2) whether there was a

> lack of opportunity for meaningful negotiation; (3) whether the agreement was printed on a duplicate or boilerplate form drafted solely by the party in the strongest bargaining position; (4) whether the terms of the agreement were explained to the weaker party; (5) whether the aggrieved party had a meaningful choice or instead felt compelled to accept the terms of the agreement; and (6) whether the stronger party employed deceptive practices to obscure key contractual provisions.

*Feacher v. Hanley*, No. 13-CV-92, 2014 WL 119382, at *6 (D. Utah Jan. 13, 2014) (quoting *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 403 (Utah 1998)). "None of the factors is dispositive; rather, [courts] consider all the circumstances in light of the doctrine's purpose to prevent oppression and unfair surprise." *Id.* (quoting *Ryan*, 972 P.2d at 403 (internal quotation marks omitted, alteration in original)). Unlike substantive unconscionability, procedural unconscionability by itself will "rarely render[] a contract unconscionable." *Knight Adjustment Bureau v. Lewis*, 228 P.3d 754, 757 n.4 (Utah 2010) (internal quotation marks omitted).

With respect to substantive unconscionability, Plaintiff argues that the arbitration provision is unconscionable because it requires Plaintiff "to arbitrate virtually every future dispute with AMEX notwithstanding the limitation related to AMEX agreements." (Opp'n. Br. at 16-17; *see also id.* at 18-19).[6] Although Plaintiff relies on the general proposition under Utah law that "courts

---

[6] Plaintiff argues also that no agreement to arbitrate was ever formed because "no reasonable person would have agreed to bind themselves to arbitrate virtually all future disputes with AMEX . . . ." (Opp'n. Br. at 5). This argument is identical to Plaintiff's claim of substantive unconscionability. (*See id.* at 18 ("As explained above, the Arbitration Clause is substantively unconscionable because it would require Plaintiff to arbitrate every dispute . . . .")). In fact, this argument relies on the same trifecta of federal cases outlined *infra*. (*Compare id.* at 5-14, *with id.* at 18-19). To the extent Plaintiff argues separately that no contract to arbitrate ever existed under Utah law, that argument is rejected. *See Errato*, 2019 WL 3997010, at *12-13 (finding Amex arbitration clause enforceable); *Brown v. Firstsource Advantage, LLC*, No. 17-CV-5760, 2019 WL 568935, at *4 (E.D. Pa. Feb. 12, 2019) ("Brown and American Express mutually intended to arbitrate disputes related to Brown's credit card account. The arbitration clause is valid and enforceable."); *Aneke v. Am. Exp. Travel Related Servs., Inc.*, 841 F. Supp. 2d 368, 376 (D.D.C. 2012) ("[T]he Court concludes that the Arbitration Provision is valid and enforceable under Utah law, which is the relevant state law in this case"); *Khanna*, 2011 WL 6382603, at *3 ("Because the Court finds that the parties entered into a valid agreement to arbitrate and that agreement covers the claims at issue . . . the Court must grant American Express's motion to compel arbitration."). *See also Goodall v. Am. Exp. Co.*, No. 18-CV-3009,

[should] avoid contract interpretations that lead to absurd results" (*id*. at 18-19), the argument fails on two separate fronts.

First, the Cardmember Agreement defines "claim" in pertinent part as, "any current or future claim, dispute or controversy relating to your Account(s), this Agreement, or any agreement or relationship you have or had with us . . . ." (Herr Decl. Ex. A at 13). "[L]ooking to the plain language within the four corners" of the document "in light of the reasonable expectations of the parties, looking to the agreement as a whole and to the circumstances, nature, and purpose of the contract," *Wittingham, LLC v. TNE Ltd. P'ship*, 469 P.3d 1035, 1053 (Utah 2020) (internal quotation marks omitted), the provision would extend to contracts between the parties that had previously expired or were in existence at the time that the parties entered into the Cardmember Agreement, nothing more. The language does not mandate arbitration for every dispute in every agreement between Amex "and Plaintiff for the rest of his natural born life." (Opp'n. Br. at 18). In fact, arbitration is required *only when elected* by one of the parties (Herr Decl. Ex. A at 13) and, frankly, "a dispute related to or arising under the Account is 'precisely what one would reasonably expect would fall under the terms of the arbitration clause,'" *Ostreicher*, 2020 WL 3414633, at *7 (quoting *Damato v. Time Warner Cable, Inc.*, No. 13-CV-994, 2013 WL 3968765, at *7 (E.D.N.Y. July 31, 2013)).

Second, "[i]n Utah, contract provisions are severable if the parties intended severance at the time they entered into the contract and if the primary purpose of the contract could still be accomplished following severance." *Addiction Treatment Ctrs., Inc. v. Shadow Mountain, LLC*, No. 16-CV-339, 2020 WL 2543238, at *4 (D. Utah May 19, 2020) (internal quotation marks

---

2019 WL 4306404, at *3 (M.D. Fla. Aug. 26, 2019) ("Goodall assented to the terms of the Cardmember Agreement (and therefore the Arbitration Provision) by using the Account and keeping the credit card."), *adopted by* 2019 WL 4305485 (M.D. Fla. Sept. 11, 2019).

11

omitted). Here, the contract has a severability clause (Herr Decl. Ex. A at 14) and the purpose of the contract (*i.e.*, providing consumer credit) could still be accomplished if the offending portion of the arbitration clause were removed. As such, the Court "will not go so far as to invalidate the entire arbitration clause on the basis of" this argument. *See Ostreicher*, 2020 WL 3414633, at *6.[7]

Separate and apart from substantive unconscionability, Plaintiff has failed to establish that the arbitration clause was procedurally unconscionable under Utah law. On this issue, Plaintiff argues that the arbitration clause "meets at least four of the six indicia of procedural unconscionability under Utah law." (Opp'n Br. at 22). Specifically, Plaintiff does not claim that she did not have an opportunity to understand the Cardmember Agreement (the first factor) or that its terms were not explained to her (the fourth factor). Rather, Plaintiff maintains that: (1) "Plaintiff, as a consumer, had no meaningful way to negotiate [with Amex] outside of the opt-out provision" (the second factor); (2) "the [c]lause is a basic standard-form contract" (the third factor); (3) Plaintiff felt compelled to accept the arbitration clause (the fifth factor); and (4) Amex "attempt[ed] to hide the terms of the Arbitration Clause in . . . denser, harder-to-read text" (the sixth factor). (*Id*. at 20-22). Mindful that Utah's procedural unconscionability analysis "consider[s]

---

[7] Plaintiff's argument that the arbitration clause is impermissibly broad relies on three distinguishable federal cases, none of which are controlling. In the first case, *Smith v. Steincamp*, 318 F.3d 775 (7th Cir. 2003), the plaintiffs took out payday loans whose underlying contracts contained arbitration clauses. When two plaintiffs filed suit against the creditor regarding *subsequent* loan contracts that did not contain arbitration clauses, the court refused to conclude that the latter contracts were bound by the former contracts' arbitration clauses. *Id*. at 778. The arbitration clause in the second case, *In re Jiffy Lube Int'l, Inc.*, 847 F. Supp. 2d 1253 (S.D. Cal. 2012), was contained in a contract concerning a plaintiff's oil change. When the plaintiff joined a putative class action alleging a claim under the Telephone Consumer Protection Act ("TCPA"), the court refused to enforce the oil change contract language "that any and all disputes, controversies or claims . . . will be resolved by mandatory arbitration." *Id*. at 1262. As for the final case, *Wexler v. AT&T Corp.*, 211 F. Supp. 3d 500 (E.D.N.Y. 2016), that arbitration clause was in plaintiff's contract with her cell phone service provider. When that plaintiff brought a TCPA claim against her provider's subsidiary, the court refused to enforce the agreement that the parties would "arbitrate all disputes and claims between" themselves. *Id*. at 501. In contrast to these cases, the dispute here "arises from the conduct related to the credit card account [Plaintiff] opened when [s]he entered into h[er] . . . Cardmember Agreement . . . and agreed to resolve any claims, including the claims based on statute, by individual arbitration." *Brown*, 2019 WL 568935, at *4 (distinguishing *Jiffy Lube* and *Wexler*).

all the circumstances in light of the doctrine's purpose to prevent oppression and unfair surprise," and that "[n]one of the factors is dispositive," *Feacher*, 2014 WL 119382, at *6 (quoting *Ryan*, 972 P.2d at 403), the Court finds these arguments unpersuasive.

Plaintiff's arguments offer little in the way of presenting "oppression and unfair surprise." Conceding that the Cardmember Agreement contained a mechanism that allowed Plaintiff to opt-out of the arbitration clause—a provision she did not invoke (Herr Decl. ¶ 4)—the first two arguments complain that the Cardmember Agreement was a contract of adhesion. However, while "courts acknowledge that standardized consumer contracts are generally adhesive," that does not mean that the contract is, *ipso facto*, unconscionable. *See Mitchell*, 280 F. Supp. 3d at 1292-93. As to the third argument, that Plaintiff was "compelled" to accept the contract, the Utah Supreme Court's decision in *Ryan* is particularly instructive. The plaintiff in that case argued that the employment contract he signed was unconscionable in part because he had no choice but to accept his status as an "at-will" employee. *Ryan*, 972 P.2d at 403. The Utah Supreme Court rejected that argument and observed in part, "Although Ryan may have wanted to work at Dan's, he was free to seek employment with another pharmacy that did not maintain at-will employment." *Id*. at 404. That logic is applicable here; in the same way the plaintiff in *Ryan* could have quit his job to work at another pharmacy, Plaintiff could have sought another credit card from another company.[8] As to the final argument, that Amex sought to hide the arbitration clause, the face of the Cardmember Agreement belies that claim. Totaling sixteen pages, the arbitration clause is located on page

---

[8] The species of "compulsion" envisioned by the unconscionability analysis is highlighted by the Utah Supreme Court's contrast of the facts in *Ryan* to the facts in *Sosa v. Paulos*, 924 P.2d 357 (Utah 1996). In the latter case, the plaintiff "received an arbitration agreement along with two consent forms less than an hour before she underwent knee surgery. She was already dressed in surgical clothing when someone from her surgeon's office gave her the three documents, one of which was the arbitration form, and asked her to sign them." *Ryan*, 972 P.2d at 403 (citing *Sosa*, 924 P.2d at 364). Plaintiff was not in such a vulnerable position.

13

twelve—a page labeled "**Claims Resolution**" in bold black lettering at the top of the page and underneath the heading "**Arbitration**." (Herr Decl. Ex. A at 13 (bold and underline in original)).

In short, Plaintiff has not established the presence of procedural unconscionability. Plaintiff has made no showing that she did not understand the terms of the Cardmember Agreement, that she did not have time to review the contract before accepting it, or that she was compelled to accept its terms. Moreover, the evidence reveals that Plaintiff agreed to the terms of the consumer credit agreement under Utah law and then failed to invoke the provision that would have extricated her from having to arbitrate any claims against Amex. Plaintiff cannot change the rules of the game at this juncture to avoid the bargain she made with Amex. "The law enables parties to freely contract, establishing terms and allocating risks between them. The law even permits parties to enter into unreasonable contracts or contracts leading to a hardship on one party." *Ryan*, 972 P.2d at 402 (internal citations omitted).

    b. <u>The FCRA Claims Fall Within the Scope of the Arbitration Clause</u>

Before turning to the substance of the second prong, as noted above, the Court must consider: (1) whether the Court may decide if Plaintiff's claims fall within the scope of the arbitration clause; and (2) whether Congress intended that FCRA claims be exempted from arbitration. (*See* discussion *supra*.). As to the first issue, the parties agree that the Court has authority to determine the scope of the arbitration provision. (*See* Amex Br. at 8-9; Opp'n. Br. at 5 ("The Court is therefore empowered to decide not only issues surrounding contract formation and scope of the Arbitration Clause on a motion to compel, but also the unconscionability . . . ."); Reply Br. at 8-9). The Court agrees with the parties' position; indeed, the Second Circuit has instructed "that questions of arbitrability are to be sent to arbitration if and only if the parties clearly and unmistakably expressed their intention to do so." *VRG Linhas Aereas S.A. v. MatlinPatterson*

*Global Opportunities Partners II L.P.*, 717 F.3d 322, 325 (2d Cir. 2013) (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 945 (1995)). Here, a plain reading of the Cardmember Agreement excludes from "claim," and hence arbitration, disputes regarding "the validity, enforceability or scope of the Arbitration provision." (Herr Decl. Ex. A at 13). As to the second issue, neither party has argued that Congress intended that FCRA claims be exempted from arbitration and it is well-established that FCRA claims are arbitrable. *See, e.g.*, *Ostreicher*, 2020 WL 3414633, at *9 (collecting cases). Consequently, the Court may continue to the second prong of the arbitrability analysis and determine whether the FCRA claims fall within the scope of the arbitration clause

The analysis regarding the second prong is straightforward. The Cardmember Agreement reflects that the parties agreed that either "may elect to resolve any claim by individual arbitration," and that the term "claim" was defined in pertinent part as "any current or future claim, dispute or controversy relating to your Account(s), this Agreement, or any agreement or relationship you have or had with us . . . includ[ing] but . . . not limited to . . . claims based upon contract, tort, fraud, statute, regulation, common law and equity . . . ." (Herr Decl. Ex. A at 13). This language encompasses Plaintiff's statutory FCRA claims. Plaintiff argues that since the Cardmember Agreement contains no "affirmative duty" for Amex to provide information to credit reporting agencies, the FCRA claims are outside the scope of the arbitration clause. (Opp'n. Br. at 15). This is simply incorrect. Plaintiff's FCRA claims—which originate from Amex's alleged failure to report correctly amounts due and owing from Plaintiff on the credit card issued pursuant to the Cardmember Agreement—clearly relate to the account opened by the Cardmember Agreement *as well as* the contract itself. Indeed, Plaintiff "agreed that [Amex] will give information about the

15

Account to credit reporting agencies." (Herr Decl. Ex. A at 11). Consequently, Plaintiff's FCRA claims fall within the scope of the Cardmember Agreement's arbitration clause.

II. Motion for a Stay Pending Arbitration

The FAA instructs that when a "suit or proceeding [is] brought . . . upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration . . . shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . ." 9 U.S.C. § 3. As Plaintiff's FCRA claims against Amex must be arbitrated under the Cardmember Agreement, the proceeding is stayed as to Amex pending resolution of arbitration. *See Ostreicher*, 2020 WL 3414633, at *9-10; *Gaul v. Chrysler Fin. Servs. Ams. LLC*, No. 13-CV-433, 2013 WL 3828549, at *3 (N.D.N.Y. July 23, 2013), *affirmed* 657 F. App'x 16 (2d Cir. 2016).

## CONCLUSION

Based upon the foregoing, Amex's motion to compel arbitration is GRANTED. The case, insofar as it concerns Amex, is stayed pending arbitration. The Clerk of the Court is respectfully directed to terminate the pending motion sequence at Doc. 44.

SO ORDERED:

Dated:  New York, New York
        October 29, 2020

_____
PHILIP M. HALPERN
United States District Judge